## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

JAMES HENRY ALSTON,

     Plaintiff,

     v.

MARYLAND DEPARTMENT OF HEALTH
and
MARYLAND DEPARTMENT OF
HEALTH, DIVISION OF COST
ACCOUNTING AND REIMBURSEMENTS,

     Defendants.

Civil Action No. TDC-18-2361

### MEMORANDUM OPINION

Plaintiff James Henry Alston has filed this civil action against the Maryland Department of Health ("MDH") and the Maryland Department of Health, Division of Cost Accounting and Reimbursements ("DCAR"), alleging that the failure to promote him to the position of Fiscal Accounts Technician Supervisor in June 2017 constituted sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17 (2018). Defendants have filed a Motion for Summary Judgment, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED.

### BACKGROUND

#### I.    Employment History

James Henry Alston, a bisexual man, began working at MDH as a contractor in 2004 and obtained a permanent position as an Administrative Specialist III and Accounting Associate in

November 2005. On January 3, 2012, Alston took a position in DCAR. DCAR is the department within MDH that secures payment for services rendered at MDH healthcare providers and inpatient facilities, including Medicaid and Medicare payments for allowable MDH inpatient costs.

Within DCAR, Alston first worked as a Fiscal Accounts Clerk I. On October 22, 2012, Alston was promoted to Fiscal Accounts Technician I through a non-competitive promotion. Alston was subsequently promoted to Fiscal Accounts Technician II through another non-competitive promotion.

Deborah Brown-Demery, the DCAR Fiscal Services Manager, supervised Alston in his various roles at DCAR. Alston contends that, during his time at DCAR, all of the individuals in supervisory positions were women, except for Wayne Watts, the DCAR Information Services Manager. By contrast, Defendants have submitted an organizational chart reflecting that as of 2017, there were three men and eleven women in supervisory roles at DCAR.

## II.     The Promotion Decision

On January 26, 2017, Brown-Demery learned that the DCAR Fiscal Accounts Technician Supervisor, Karen Gonshor, intended to retire in March 2017. Because there was a hiring freeze in place at the time, Brown-Demery requested and received a freeze exemption to allow for the position to be filled. The position was to be limited to internal candidates from within DCAR.

As Gonshor's departure approached, Brown-Demery asked Alston and Iva Blake, a woman who was working in DCAR in an administrative capacity, to train with Gonshor during her last two weeks. During these two weeks, Brown-Demery observed that Blake trained with Gonshor more frequently than Alston did. According to Alston, no formal training schedule was ever established and he was not provided with the same training opportunities as were provided to Blake. When he approached Gonshor on multiple occasions and sought training, he saw that she

2

was training Blake, and she told him to come back at a later time. He therefore trained with Gonshor for only two or three days during that two-week period. By contrast, Brown-Demery believed that it was Alston's responsibility to schedule training with Gonshor. She has stated that Alston told her that he elected not to train with Gonshor very frequently because he "could not take the way her voice sounded," felt that he "knew what he needed to know," and was confident that he was the "best candidate" to fill the role. Brown-Demery Aff. ¶ 10, Mot. Summ. J. Ex. 3, ECF No. 49-5.

At the end of the two-week training period, Blake spoke to Brown-Demery and offered to assist with Gonshor's duties until the position was permanently filled. Alston did not make a similar offer. Brown-Demery then placed Blake in the role of the Acting Fiscal Accounts Technician Supervisor until the position was permanently filled.

On April 20, 2017, Brown-Demery circulated a job announcement among DCAR staff for the Fiscal Accounts Technician Supervisor role. The job announcement stated that the purpose of the role was to supervise DCAR's Central Office Insurance Unit, which processes bills and collects revenue from health care providers and insurance companies, and to develop, modify, and implement policies and procedures relating to all Insurance Managed Care issues. The job announcement also provided the minimum qualifications, selective qualifications, and preferred qualifications for the role. The minimum qualifications included: (1) a high school diploma or high school equivalency certificate; and (2) "three years of experience reconciling agency accounting systems to fiscal control systems or developing automated spreadsheets, ledgers, and reports using accounting software packages or identifying budget trends and recommending budget realignments." Job Announcement at 2, Mot. Summ. J. Ex. 4, ECF No. 49-6. The selective qualifications included at least six months of experience involving the "analysis of claims

submitted using a Hospital Management Information System (HMIS)." *Id.*  The preferred qualifications included:  (1) detail orientation with exceptional customer service skills; (2) experience in a health care setting or insurance company; (3) proficiency in Microsoft Excel and Word; and (4) experience in a supervisory or lead role.

By the terms of the job announcement, the position was limited to current DCAR employees.  Only two individuals applied for the role, Alston and Blake.  Both had the requisite experience, including the required HMIS experience.  However, in their existing positions, neither candidate had full access to the billing section of HMIS.  According to Alston, he had more experience working in DCAR, and more experience working with the analysis of submitted claims in HMIS, than Blake.  According to Alston, Blake's service in the acting supervisor role was necessary for her to meet the minimum requirement of experience involving the analysis of claims submitted using a HMIS.

On May 23, 2017, both Alston and Blake interviewed for the role.  Both were interviewed by a panel consisting of Elizabeth Davis, the Chief of DCAR; Watts; and Brown-Demery.  Brown-Demery's role was as an observer during the interview.  As the appointing authority, Davis was the final decisionmaker on the hiring decision.  During the interview, both candidates were asked the same 11 questions.  Each panelist took notes during the interview.  Blake's interview lasted between 15 and 20 minutes.  Alston's interview lasted approximately 45 minutes.  According to Davis, Blake's interview was shorter because she provided concise, direct answers, compared to Alston's "very wordy" answers.  Davis Aff. ¶ 11, Mot. Summ. J. Ex. 2, ECF No. 49-4.

Following the interviews, Davis and Watts discussed both candidates' interviews.  Davis and Watts agreed that Blake's interview was stronger.  In particular, both Davis and Watts concluded that Alston had provided insufficient answers to Questions 1, 3, and 8.  Question 1

4

asked the candidates to describe their experience with insurance accounts receivable. In response, Alston discussed his experience with collections, which Davis considers to be distinct from accounts receivable. By contrast, while Blake acknowledged that she had not learned about accounts receivable in college, Davis concluded that Blake "demonstrated that she understood insurance accounts receivable." *Id.* ¶ 13(a).

Question 3 asked the candidates whether they "had ever dealt with an insurance company to resolve issues with unpaid, denied (rejected) claims." Mot. Summ. J. Ex. 2 at 8, ECF No. 49-4. In response, Alston discussed his personal experience interacting with his personal insurance provider, which Davis did not consider to be a good response because the position requires interaction with insurance providers on commercial matters. By contrast, Blake discussed her professional experience working with insurance companies in a commercial setting.

Question 8 asked the parties when they would "recommend that an insurance account be sent to central collections." *Id.* Alston stated that he would recommend that such action occur after 45 to 60 days, which Davis considered to be an incorrect answer. Blake stated that she would recommend that such action occur after 90 to 120 days, which Davis considered to be the correct answer.

After the interviews, Davis decided to select Blake for the position based on her stronger interview performance, her prior commercial health insurance experience, and her requisite experience analyzing claims submitted using a HMIS. On June 7, 2017, Watts informed Alston that he was not selected for the position.

## III.    Discriminatory Statements

Alston alleges that, during his time at DCAR, Brown-Demery and Blake made discriminatory comments about LGBTQ individuals. Specifically, he asserts that on October 17,

5

2016, Brown-Demery and Blake made derogatory comments about the voice of a transgender woman who had delivered office supplies to DCAR. Alston alleges that Brown-Demery referred to this individual as "the one that looks like a man." Brown-Demery Aff. ¶ 5. Brown-Demery has stated that she does not recall making such a statement or mocking the person's voice. Alston further alleges that there "probably were various conversations" at DCAR that painted "LGBT people in a very negative light." Alston Dep. at 31, Mot. Summ. J. Ex. 1, ECF No. 49-3.

## IV. Procedural History

On September 11, 2017, Alston filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") in which he asserted that the failure to promote him constituted discrimination on the basis of sex. On May 1, 2018, Alston received a Notice of Right to Sue. On August 1, 2018, Alston filed the original Complaint in the present case. In the Amended Complaint, Alston alleged claims of discrimination on the basis of sex and sexual orientation, in violation of Title VII and Maryland Executive Order 01.01.2007.09, against the MDH and DCAR, as well as against Davis, Brown-Demery, Watts, the Governor of Maryland, and one other individual. On January 4, 2019, the defendants filed a Motion to Dismiss. On September 17, 2019, the Court (Grimm, J.) issued a Memorandum Opinion and Order in which it granted the motion in part and dismissed the claims for sexual orientation discrimination, those under the Maryland Executive Order, and those against defendants other than MDH and DCAR. Thus, the only remaining claim is the Title VII claim for sex discrimination against the MDH and DCAR (collectively, "the State Defendants").

## DISCUSSION

In their Motion for Summary Judgment, the State Defendants seek summary judgment under Federal Rule of Civil Procedure 56 based on their assertion that there are no genuine issues of material fact and that, based on the record evidence, no reasonable jury could find in favor of Alston on his claim.

### I.     Legal Standard

Under Rule 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248–49.

### II.    Sex Discrimination

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII requires a plaintiff to establish a claim through one of two methods. The plaintiff may either demonstrate through direct or circumstantial evidence that the plaintiff's membership

7

in a protected class motivated the employer's adverse employment decision, or the plaintiff may proceed through the burden-shifting approach espoused in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019). Under the *McDonnell Douglas* framework, the employee must first establish a *prima facie* case of discrimination. *Haynes*, 922 F.3d at 223. If the plaintiff establishes a *prima facie* case successfully, the burden shifts to the employer to provide a "legitimate, nondiscriminatory reason for the adverse employment action." *Id.* Finally, if such a showing is made, the burden shifts back to the plaintiff to prove that the employer's stated reasons were not its true reasons, but were a pretext for discrimination. *Id.* Because Alston has not provided direct or circumstantial evidence that this particular hiring decision was motivated by sex discrimination, the Court analyzes this case under the *McDonnell Douglas* framework.

### A.   *Prima Facie* Case

To establish a *prima facie* claim for sex discrimination based on non-selection or non-promotion, a plaintiff must show that: (1) the plaintiff is a member of a protected class; (2) the plaintiff applied for the position in question; (3) the plaintiff was qualified for the position; and (4) the plaintiff was rejected for the position under circumstances giving rise to an inference of unlawful discrimination, which includes when the position was filled by an applicant from outside the protected class. *Brown v. McLean*, 159 F.3d 898, 902 (4th Cir. 1998); *Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994).

As to the first prong, the parties do not dispute that, as a man, Alston is a member of a protected class. *See Lucas v. Dole*, 835 F.2d 532, 533–34 (4th Cir. 1987) (permitting a "reverse discrimination" case to proceed); *Auston v. Schubnell*, 116 F.3d 251, 254 (7th Cir. 1997); *Mariani-Colon v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 222 (1st Cir. 2007) (finding that

a male plaintiff was a member of a protected class in a Title VII case based in part on claims of sex discrimination); *Popoli v. Bd of Tr. of Hartford Cmty. Coll.*, No. JFM-16-0452, 2017 WL 4457153, at *4 (D. Md. Oct. 4, 2017) (finding that a male plaintiff was a member of a protected class in a Title VII failure-to-hire case).  On the second and third prongs, the parties also do not seriously dispute that Alston applied for and was generally qualified for the position of Fiscal Accounts Technician Supervisor.

As for the fourth prong, in cases of a failure to hire or promote, where the position sought is filled, the fourth prong is typically satisfied by showing that the individual ultimately selected is from outside of the plaintiff's protected class. *Miles v. Dell, Inc.*, 429 F.3d 480, 488 (4th Cir. 2005); *Langerman v. Thompson*, 155 F. Supp. 2d 490, 495 (D. Md. 2001).  Where Blake, a woman, was hired for the position and is from outside of Alston's protected class, Alston has satisfied all four prongs of a *prima facie* case. *See Langerman*, 155 F. Supp. 2d at 496 (finding that the fourth prong of a *prima facie* case of race and sex discrimination was established because the plaintiff was a white male and the candidate actually selected was a Black female).

**B.    Legitimate, Nondiscriminatory Reason**

When a plaintiff has provided sufficient evidence to demonstrate a *prima facie* case, the next step in the *McDonnell Douglas* analysis is that the defendant has a burden of production to put forth evidence of a legitimate, nondiscriminatory reason for the non-selection. *McDonnell Douglas*, 411 U.S. at 803; *Haynes*, 922 F.3d at 223.  Here, Davis asserts that Blake was promoted over Alston for a legitimate, nondiscriminatory reason:  Blake's stronger performance during the interview.  Where Davis and Watts determined that Blake was better suited for the role based on her stronger interview performance, Defendants have advanced a legitimate, nondiscriminatory reason for their promotion of Blake over Alston. *See Hux v. City of Newport News*, 451 F.3d 311,

9

319 (4th Cir. 2006) (stating that "[i]nterviews are an important tool . . . and [the court] may not lightly overturn the reasonable conclusions an employer reaches after actually meeting with a candidate face-to-face"); *Harris v. Mayor & City Council of Baltimore*, 429 F. App'x 195, 203 (4th Cir. 2011) (finding that the defendant's proffered reason for promoting another candidate over the plaintiff, the candidate's higher interview scores, was a legitimate, nondiscriminatory reason for its actions).

## C. Pretext

Upon a showing of a legitimate, nondiscriminatory reason for a challenged employment action, a plaintiff must demonstrate that the articulated reason was not the true reason for his non-selection but instead was a pretext for discrimination. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007). At this point, the plaintiff's burden to demonstrate pretext has merged with the ultimate burden to prove that the plaintiff has been the victim of intentional discrimination. *Id.* Accordingly, to satisfy the pretext requirement, a plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason." *Adams v. Tr. of the Univ. of N.C.–Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)).

Here, Alston has failed to identify genuine issues of material fact on the issue of pretext. "In order to show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons . . . are inconsistent over time, false, or based on mistakes of fact." *Haynes*, 922 F.3d at 225. While Alston seeks to identify shortcomings in Blake's interview answers and more generally criticizes the fairness of the interview process, Alston does not provide a persuasive basis to dispute Davis's assertion that his answers to Questions 1, 3, and 8 were incorrect or unfavorable, and that Blake's responses on these points were better. Alston has therefore failed to demonstrate that

Defendants' proffered nondiscriminatory reason, that Blake's interview was stronger, is false or based on mistakes of fact.

Alston also seeks to establish pretext by arguing that he was more qualified and had more experience at DCAR than Blake. However, where Blake met all of the qualifications for the position, Alston's longer tenure and subjective view of his capabilities as compared to those of Blake do not give rise to an inference of sex discrimination. *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 270 (4th Cir. 2005) (rejecting the argument that the plaintiff should have been selected because she had more experience with the employer because a plaintiff "may not choose the criteria by which an employer makes a promotion decision"). Notably, he also does not provide a basis to dispute the facts that Blake received more extensive training from Gonshor before her departure, and that, as noted by Davis, he, but not Blake, lacked experience relating to the health insurance industry. Instead, Alston argues only that he did not need the additional training because he had received informal training from Gonshor over the years, that Gonshor had "always [been] willing to share information," Alston Dep. at 30, Reply Ex. 1, ECF No. 55-1, and that if he was selected, he would seek additional training and guidance from another DCAR employee who had reported to Gonshor and was an expert in insurance matters. These assertions do not refute Defendants' claims that Blake's training from Gonshor and health insurance experience were factors that favored Blake.

Alston also argues that the stated reason for Blake's selection was pretextual because the evidence demonstrates that Blake was preselected for the role, as reflected by the additional training opportunities DCAR provided to her and by the fact that she served as the Acting Fiscal Accounts Technician Supervisor. Alston, however, does not dispute that Blake specifically asked to serve as the acting supervisor while he did not. More importantly, even if, when viewed in the

11

light most favorable to Alston, the evidence could support the conclusion that Blake was the preferred candidate of DCAR leadership, that would not be sufficient to establish sex discrimination under Title VII, because beyond showing that the proffered reason was pretextual, a plaintiff must also demonstrate that discrimination was the real reason for the non-selection. *See . Adams*, 640 F.3d at 560.  Alston has failed to provide evidence that is sufficient to support that conclusion.

Alston first alleges that the gender breakdown of DCAR leadership suggests discriminatory intent because there was only one male supervisor in DCAR at the time of the promotion decision. Notably, however, Defendants have provided an organizational chart showing that there were three male supervisors in DCAR, and Alston has not provided a basis to conclude that the chart is inaccurate.  Moreover, a male supervisor, Watts, was on the interview panel and rated Blake higher.  The presence of a member of the protected class on the interview panel tends to weaken any claim of discriminatory motivation. *See Love v. Alamance Cnty. Bd. of Educ.*, 757 F.2d 1504, 1509 (4th Cir. 1985) (stating that the presence of women and African Americans on the relevant selection committees was "an intentional safeguard against discriminatory practices"); *Demesme v. Montgomery Cnty. Gov't*, 63 F. Supp. 2d 678, 683 (D. Md. 1999) ("The fact that the decision makers were of the same protected class suggests no discriminatory motivation.").

Alston's only other evidence of any kind of discriminatory animus is Alston's assertion that in 2016, Brown-Demery and perhaps other DCAR employees made comments suggesting animus toward LGBTQ individuals, including referring to a transgender delivery person as "the one that looks like a man."  Brown-Demery Aff. ¶ 5.  This limited evidence does not create a genuine issue of material fact for several reasons.  First, where the Court previously dismissed the aspect of Alston's claim of sex discrimination based on a theory of discrimination based on sexual

orientation, that issue is no longer before the Court. *See Alston v. State of Md. Dep't of Health et al.*, No. PWG-18-2361, 2019 WL 4447234, at *3 (D. Md. Sept. 17, 2019). Second, Alston has not presented sufficient evidence to show that Brown-Demery was aware of Alston's sexual orientation as bisexual. The only evidence presented by Alston on this point was an account of an incident involving possible biased statements by another employee that was sufficiently notorious that he assumed that it caused Brown-Demery to learn of his sexual orientation from her superiors, but he did not provide a clear explanation for how she would have been so informed.

Third, there is no evidence that Davis, who was the actual decisionmaker for the hiring selection, was aware of Alston's sexual orientation or had any discriminatory animus of any kind. *See Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir. 2010) (stating that in assessing discriminatory animus, "[i]t is the decision maker's intent that remains crucial") Davis has explicitly denied that she knew Alston's sexual orientation at the time of the hiring decision. Even if, as argued by Alston, there may be a genuine issue of fact on whether Brown-Demery was only an observer in the interview or actually had a larger role, the evidence does not support the conclusion that she, not Davis, was the actual decisionmaker and that Davis merely accepted or rubber-stamped her decision. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 288–89, 291 (4th Cir. 2004) (finding that, in order for the discriminatory intent of a non-decisionmaker to be imputed to the decisionmaker, the non-decisionmaker cannot merely have had a "substantial influence on the ultimate decision" or played a "significant" role in the decision, but must have been "principally responsible for, or the actual decisionmaker behind, the action"), *overruled in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). Under these circumstances, the statement about a transgender individual by Brown-Demery and the more general allegation of other statements derogatory of LGBTQ individuals by others are insufficient

13

to establish a genuine issue of material fact on whether the decision to select Blake rather than Alston was based on sex discrimination. *See Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999) (finding that a statement by a co-worker favored by the Board members that he could not work for a woman, in addition to two other alleged statements arguably reflecting gender bias, were insufficient to support the conclusion that the Board's decision to demote the female manager of a recreation club was based on sex discrimination). The Court will therefore grant the Motion for Summary Judgment.

## CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment will be GRANTED. A separate Order shall issue.

Date:  March 21, 2023

THEODORE D. CHUANG
United States District Judge

14